■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ARTURNO-MARTIN ACUNA, Respondent.—Appeal by the People, as limited by their notice of appeal and brief, from so much of an order of the Supreme Court, Queens County (Rotker, J.), dated October 13, 1987, as after a hearing, granted that branch of the defendant's omnibus motion which was to suppress his videotaped statements.

Ordered that the order is reversed insofar as appealed from, on the law and the facts, and that branch of the motion which was to suppress the defendant's videotaped statements is denied.

The hearing testimony consists solely of Sergeant Pepe's testimony. We accord much weight to the hearing court's findings of fact (see, *People v Prochilo,* 41 NY2d 759, 761), to wit: "On January 23, 1987, one Robert Vaughn was found in the bedroom of his apartment at 146-59 Bay Street, Far Rockaway, Queens, dead from a gunshot wound to his head * * * Sergeant Pepe, then a detective in the 101st Precinct

Investigation Unit, was assigned to investigate the homicide. He spoke to a two-year-old baby of the deceased who mentioned the words 'Paco, Paco' and pointed with his finger as apparently being the person who had been present in the premises at or before the time the victim was shot. The deceased's wife was also interviewed and told Pepe that she came home from work at approximately 5:30 P.M. on January 23 and walked into the bedroom and saw her husband lying in a pool of blood of the bedroom floor. She also said that there were various items of property missing, including some of her jewelry. She related to [Sergeant] Pepe that the deceased and the defendant, also known as Paco, sometime in the beginning of January kidnapped a person known as 'Hurtado Dionsio' (phonetic) * * *. Further investigation by Pepe revealed that Paco had a girlfriend 'Crissie Quintero' (phonetic) who lived at 1265 Herkimer Street, Brooklyn. At about 9:00 P.M. on January 28, 1987 Pepe and other police officers went to the Herkimer Street [address] to try and find out where Paco lived and arrest him for the kidnapping. Pepe asked [John] Quintero and his daughter to go with them to the 67th Precinct [in Brooklyn] for further interrogation and as they were leaving the building [the defendant] entered the premises and sped up the one flight to the apartment above * * * John Quintero then went upstairs and brought [the defendant] down. [The] defendant was detained and Quintero gave permission to the police officers to search the upstairs premises. In a small bedroom upstairs, not the one used by Crissie or the defendant, the frame of a gun and other property were seized".

The defendant was transported to the 101st Precinct in Queens. At approximately, 1:00 A.M., Sergeant Pepe began to question the defendant without giving him *Miranda* warnings. The defendant stated, "I know what I did and I have to pay for it". Although Pepe testified that he interrupted the defendant to read him his *Miranda* rights, and that thereafter the defendant voluntarily gave oral and written statements, the court rejected that portion of Pepe's testimony and ruled that the defendant was not advised of his *Miranda* rights, nor did he knowingly and voluntarily waive his rights against self-incrimination. The People do not appeal that part of the court's ruling. At approximately 5:51 A.M., an Assistant District Attorney interviewed the defendant on videotape and recorded the defendant's statements, which were exculpatory in nature and to the effect that he acted in self-defense with regard to the shooting. The court granted the defendant's

motion to suppress those videotaped statements on the grounds that (1) the statements were the product of an illegal arrest and (2) the statements were not voluntarily made.

Upon our examination of the court's findings of fact and our review of the record, we cannot adhere to the court's conclusion that the defendant's arrest was illegal because the investigation into the kidnapping was merely a subterfuge in order to enable the police to interrogate the defendant. We are convinced that probable cause existed for the defendant's arrest. "Probable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrant a conviction * * * but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed" *(People v McRay,* 51 NY2d 594, 602). The record reveals that the deceased's wife told the police that her husband had released the kidnapped victim when the defendant and another person left to call for the ransom money. Sergeant Pepe interviewed the individual who was kidnapped and he corroborated the information Pepe had obtained from the deceased's wife. The police officer's testimony was not contradicted or shown to be " 'manifestly untrue, physically impossible, contrary to experience, or self-contradictory' " *(People v Stroman,* 83 AD2d 370, 373); moreover, it appears that the court found his testimony regarding his investigation of the kidnapping to be credible. A defendant's Fourth Amendment rights are not violated even if the purpose of a lawful arrest is to question him about another offense *(see, People v Cypriano,* 73 AD2d 902, 903).

We also believe that probable cause existed to arrest the defendant for the homicide. The deceased's two-year-old son had mentioned the words, "Paco, Paco", and pointed with his thumb up and forefinger ahead—at a 90° angle, indicating to the police that the defendant had committed the crime. The police also had information that the deceased and the defendant were involved in a kidnapping. Further, at the sight of the police, the defendant fled *(see, People v Leung,* 68 NY2d 734, 736). "[A]dditional evidence of furtive or evasive behavior on the part of the participants suffices to establish probable cause * * *. Such evidence, suggesting consciousness of guilt, has traditionally been considered some proof of a crime" *(People v McRay, supra,* at 604; *People v Yazum,* 13 NY2d 302, 304-305, *rearg denied* 15 NY2d 679).

Also, contrary to the court's conclusion that the defendant's "limited command" of the English language prevented him

from validly waiving his *Miranda* rights, a review of the subject videotape demonstrates that the defendant explicitly acknowledged his understanding of the *Miranda* rights before he was interrogated by the Assistant District Attorney. The defendant, although a native of Panama, stated that he understood English if spoken to him slowly. He asked the Assistant District Attorney to repeat one of the rights read to him and the prosecutor readvised him of that right and he expressed his comprehension. The prosecutor spoke slowly to the defendant and the defendant gave a detailed statement in English. Therefore, we cannot conclude that the defendant did not knowingly and voluntarily waive his rights. "To constitute an effective waiver, it is not necessary that a defendant comprehend the import of the *Miranda* warnings in the abstract, so long as he is able to understand the immediate meaning of the warnings" *(People v Avilez,* 121 AD2d 391, 392, citing *People v Williams,* 62 NY2d 285; *People v Dorsey,* 118 AD2d 653, *lv denied* 67 NY2d 1052). We have viewed and listened to the videotape and find that the defendant's rights were fully conveyed to him as required by *Miranda v Arizona* (384 US 436) and that he clearly stated that he understood them and that he wished to make a statement without an attorney being present.

Finally, in view of our decision that the defendant's arrest was proper and that his videotaped statements were knowingly and voluntarily made, those statements are admissible against him. Thompson, J. P., Bracken, Eiber and Spatt, JJ., concur.