=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 14
The People &c.,
            Respondent,
        v.
Jin Cheng Lin,
            Appellant.

            De Nice Powell, for appellant.
            Anastasia Spanakos, for respondent.

RIVERA, J.:

        Defendant challenges his conviction on grounds that his

confession was an involuntary product of untoward psychological

pressure by police, and consequent fatigue induced during a

prolonged interrogation, extended, in part, by unnecessary

prearraignment delay, manufactured for the sole purpose of

- 1 -

procuring inculpatory statements.  He also contends that due to his limited English language proficiency he did not understand the import of the <u>Miranda</u> warnings given to him, and, therefore, did not knowingly and voluntarily waive his rights to counsel or to remain silent, further establishing the involuntariness of his statements to the police.

Upon our careful review of defendant's case, we conclude that the record supports the court's ultimate determination that defendant sufficiently understood his rights and that his statements were voluntarily made.  Defendant's additional grounds for reversal are either unpreserved or without merit.  Therefore, the order of the Appellate Division should be affirmed.

## I.  BACKGROUND

### A.  The Double Homicides

Defendant Jin Cheng Lin challenges his conviction for murder, burglary and attempted robbery arising from events leading to the deaths of Cho Man Ng and her brother Sek Man Ng. Defendant knew both victims and had previously been romantically involved with Cho.  Initially, defendant was not a suspect in the murders, but during the course of their investigation, detectives grew suspicious of his role in the crimes after they identified various inconsistencies in his statements to the police.  After several hours of questioning across three days, and after having

implicated two others in the crimes, defendant confessed to brutally killing Cho and Sek.

At the time of their deaths, Cho was 21 years old and worked at a telephone store, and Sek was 18 and a college student. Their parents had moved to Hong Kong and Cho and Sek lived together in an apartment in Queens. Defendant was two years older than Cho and they started dating when they were teenagers. At some point, Cho also dated Kevin Lee, who knew defendant from work. Cho and Lee eventually broke up, but approximately a year before her murder she restarted her relationship with Lee and broke up with defendant.

On the day of the murders, May 12, 2005, Sek was home while Cho was out with Lee. At approximately 9:00 p.m., Lee drove Cho to her apartment. Once back at his own home, Lee called Cho several times until she finally answered the telephone at approximately 9:25 p.m. According to Lee, Cho sounded weak and told him she was dizzy and that someone was in the house. He did not call 911, but immediately went to Cho's apartment. At about 9:30 p.m., while at work, Wailap Tsang received a call from Cho, and he also heard her say that someone was in her apartment. She told him that there was a lot of blood and asked him to call 911. Tsang drove to Cho's apartment instead.

When Lee arrived, he entered through the open, outside door and went to Cho's second floor apartment, and also found that door open. He could see a light from Sek's bedroom and

noticed that his door was open.  Lee saw a hand from under a blanket on the floor, and noticed that there was blood on the floor and walls.  When he looked at Cho's bedroom door he saw that it was closed, but noticed blood on the door and doorknob.  He then went outside and also called 911.

While Lee waited, Tsang arrived and called 911.  The two men then stood outside the building until the police arrived.  The police went up to the apartment and found Sek lying next to his bed, unconscious, in a pool of blood and partially covered with a blanket, his legs bound together.  The officers then heard a moan from Cho's bedroom and kicked in the locked door.  They found Cho on the blood-covered floor, semi-conscious, with her stomach cut open.  She was barely able to speak.  The Emergency Medical Technician pronounced Sek dead at the scene.  Cho died at about 10:30 p.m. at the hospital.

### B.  THE INVESTIGATION

In the hours following the discovery of the victims, detectives and other personnel arrived at the apartment and took pictures of the crime scene and Sek's body, dusted for fingerprints and collected other evidence.  They found a flashlight, a piece of duct tape and a duct tape roll in Sek's room.  They also collected a roll of masking tape and some masking tape with blood in Cho's room.  In the bathroom, the detectives found a knife with the blade pointed up and the handle submerged in the toilet. The knife matched the brand of knives in

a block on the kitchen counter.  The officers observed blood on the walls, floor and bed in Sek's bedroom.

Throughout the course of their investigation, the police interviewed several individuals at the precinct about the murders, including Lee and Tsang.  Most if not all were Asian, some were the victims' family and friends.  Several police officers participated in the questioning at the precinct, including members from Queens Homicide and the Organized Crime Investigation Unit.  Some officers spoke to interviewees in Cantonese as well as English.

Defendant was also one of the several people initially investigated, although at first he was not a suspect.  After several hours of questioning, defendant confessed to the murders. He was charged with six counts of Murder in the First Degree, six counts of Murder in the Second Degree, one count of Assault in the First Degree, three counts of Burglary in the First Degree, three counts of Attempted Robbery in the First Degree, and Criminal Possession of a Weapon in the Fourth Degree.

II.  <u>DEFENDANT'S INTERROGATION AND THE SUPPRESSION HEARING</u>

Defendant moved to suppress his statements to the police.  At the suppression hearing, the People submitted testimony from various detectives describing the investigation and defendant's interrogation, as well as testimonial and documentary evidence that defendant was sufficiently fluent in

English to understand the surrounding events and his constitutional rights.

According to this evidence, on May 13th, the morning after the bodies were discovered and several hours into the investigation, between 7:00 and 8:00 a.m., Detectives Marshall and Schindlar went to defendant's home and asked him to come to the precinct to discuss the deaths of Cho and Sek. Defendant agreed, went to get his jacket and shoes, and left, unhandcuffed, with the detectives in a police car. While he was waiting for defendant, Marshall asked him about a scratch he observed on defendant's forehead. Defendant responded that he hit his head on a kitchen table in his home. Detective Marshall testified that he and defendant conversed in English during this time.

At the precinct, the detectives placed defendant in a 12 by 12 foot, windowless room, that contained a desk and chairs. Marshall asked defendant if he wanted any food or drink and brought him some water. He did not discuss the crime or investigation with defendant at this time. Around 9:00 a.m., Marshall left defendant alone in the room while he went to attend the victims' autopsies.

Approximately two hours later, at 11:00 a.m., Detective Wong entered the room to speak with defendant. Defendant was not handcuffed and not under arrest. Wong had known defendant for seven to eight years, from when he was involved in defendant's prior arrest in 1998. Defendant had also assisted Wong in the

past, by serving as a filler in lineups arranged by Wong.

Wong had been called to the precinct to assist with witness interviews.  His discussion with defendant the morning of May 13th would be the first of approximately six to seven conversations between them on that day.  According to Wong, he would enter the room and talk to defendant for no more than 15 minutes at a time, then leave to interview other persons who were being questioned at the precinct as part of the investigation into the murders.  To Wong's knowledge defendant was alone in the room after Wong left.

Defendant and Wong spoke to each other in English and Cantonese, defendant's native language.  During these conversations Wong did not consider defendant a suspect, nor did he advise defendant of his Miranda rights.  Wong testified that he asked about defendant's relationship to Cho, and defendant told Wong that he knew her for approximately seven years and dated her for five of those years.  Defendant and Cho had broken up approximately a year prior, when he discovered she was cheating on him with Kevin Lee.  Defendant had come back from China two months before the murders, and he had seen Cho twice since his return, both times at his home.  On May 12th he went to Cho's apartment at about 4:15 p.m., and Sek let him in. Defendant gave Sek two animal figurines made from seashells for Cho and then, after approximately a half hour, he returned home, where he remained the rest of the night. His brother was with him

all night, and his mother returned from work after 9:00 p.m. In response to questions from Wong, defendant stated three reasons why he went to Cho's apartment that day: to get contact information for Cho's parents, who were living in Hong Kong; to engage in sexual relations with Cho; and because he "didn't want anyone to think her promiscuous."  Wong reduced to writing the information he got from defendant during these conversations and read his notes into the record at the hearing.  Wong further testified that he advised other detectives about what defendant had told him.

Around 10:00 p.m., Wong returned to the room where he, along with Detectives Hui and Shim, questioned defendant.  Hui and Shim also assisted with interviews of others at the precinct that same day.  During the conversation with these three officers, defendant spoke in both English and Cantonese to Wong and Hui, and in English to Shim.

Approximately five minutes after Hui entered the room, defendant asked to speak with him privately.  After the other detectives left, defendant told Hui he was more comfortable speaking in Chinese.  Hui spoke to defendant in Cantonese and told him not to waste his time.  Defendant asked what would happen if he stuck it out to the end or if he talked.  Hui then told him that a lot of suspects get away, as in leave the country, and if defendant knew who did it he should tell them. According to Hui, defendant then "guaranteed that the guy is not

going to leave." He then said to Hui, "what if he left and two minutes later rang the doorbell again; Sek would not come back down to check on who it was." Defendant asked if they could work out a deal and Hui told him he was not the officer on the case, but would get someone to talk to him. As Hui left the room, defendant asked to use the bathroom and said that he did not want to "squat" in jail until he was 60 or 40 years old. Hui informed the other detectives about the conversation and defendant's interest in making a deal.

Prior to leaving defendant and Hui to speak alone, Wong observed that defendant was doodling in Chinese on a piece of paper. Wong took the paper and gave it to Detective Marshall. The translated version of these writings admitted into evidence at the hearing, states, in relevant part:

> "I was imprisoned for the whole day
> For the whole day, that is how American
> police do, Freedom . . . have not but say
> have
> Yes but say no, no but say yes,
> He who is involved, laughs so loudly, but he
> Who not involved is harassed.
>
> * * *
>
> Everyone say it is I,
> Do I look like a murderer?
> Will anyone help me,
> Heaven and earth help . . . ."

After Lieutenant Belluchi decided to let defendant go and continue the questioning the next day, Marshall and Schindler drove defendant home between midnight and 1:00 a.m. on May 14th. Defendant was not handcuffed, and Marshall asked him if he would

return to the precinct the following day.  Defendant responded that Marshall could call and pick him up, and that it was "no problem."

At 11:00 a.m. the following morning, Marshall and Schindler met defendant at his home, and Marshall drove him back to the precinct where the detectives again placed him in the same room from the prior night.  At 11:40 a.m., Marshall read defendant his <u>Miranda</u> rights in English from a form.  Defendant wrote "yes" after each question regarding whether he understood the particular right mentioned, including his right to remain silent, to consult with an attorney before speaking with the police, and to have the attorney present during the questioning. Marshall then asked whether defendant was willing to answer questions, and defendant indicated that he was. Defendant, Marshall and Schindler signed this form, and it was admitted into evidence.

Marshall and Schindler proceeded to interview defendant for the next 1-1/2 to 2 hours.  They discussed his relationship with Cho and Sek, and defendant again explained that he went to the apartment between 3 and 4:00 p.m. in order to give Cho the figurines and that he returned home at about 5:00 p.m.

After talking to defendant, Marshall and Schindler left defendant alone to go speak to witnesses at the precinct about the figurines.  Upon learning from one person that Cho had the figurines in her apartment for several weeks before her death,

Marshall returned to the room and confronted defendant with this information.

He told defendant they knew he had not told the truth, but defendant stuck to his story.  Marshall then spoke with him for an hour before again leaving him alone.  About an hour later, at 7:00 p.m., the detectives returned and questioned him until about 8:30 p.m. during which time he changed his story and said that he went to Cho and Sek's apartment on May 12th to facilitate a robbery.  Defendant described how since his return from China he had been working for a Chinese bakery and restaurant in Connecticut.  At the restaurant, he met a man named Gong, who told him about a plan to rob a house in New Hampshire, and asked defendant if he knew where Gong could get money for guns and a car.  Defendant told Gong that there was money at Cho and Sek's home.  Defendant claimed he did not want to participate in the robbery, and gave Gong the address and described Cho's car.

Defendant claimed that Gong called him at the end of April and during the first week of May and asked about how he could get into the apartment. Defendant told Gong that he would go to the apartment on the afternoon of May 12th, and let Gong in. In exchange, Gong told defendant that he would give him money from the planned New Hampshire robbery.  Then, as planned, he went to the apartment on May 12th at 4:00 p.m.  Sek let him in and they talked for about 30 minutes.  As defendant left the apartment, he passed a Fukienese man standing next to the front

door talking on a cell phone.  As he walked away, defendant
watched the man enter the building. Defendant went home.  Gong
never called.  Defendant wrote out this story in English, signed
and dated the document, and noted 9:00 p.m. next to his
signature.  Marshall also signed the document, which was read and
admitted into evidence at the suppression hearing.

After defendant completed the document, Marshall
informed him that he was under arrest for assisting in the
robbery.  Marshall left the room and prepared an online arrest
form for defendant at approximately 9:30 p.m.

The detectives then proceeded to follow-up on
defendant's version of the events and tried to locate Gong and
the Fukienese man.  They contacted police in New Haven,
Connecticut and an FBI agent.  Between 9:30 p.m. on May 14th and
1:00 a.m. on May 15th, they showed defendant photographs of
people named Gong but he did not identify anyone from these
pictures.

Around 1:00 a.m. Detective Warner entered the room and
spoke with defendant in English to get more information about
Gong.  During this 90-minute questioning, defendant gave names of
others who he claimed worked with Gong, and further elaborated on
his story.  He claimed that he met Gong two or three times at a
food corporation in Connecticut, and that Gong told him he had
robbed a bookie in New Hampshire.  Defendant told Gong that Cho's
apartment would be a good place to rob, and provided Gong with

information about the physical area around the apartment and specific directions to the residence.

Then at around 5:00 a.m. defendant knocked on the door of the interrogation room, as he had in the past when he wanted to go to the bathroom or drink water.  According to Marshall, defendant had been resting on the chairs and when he went in defendant said he wanted to talk.  Defendant added again to his story and said that he told Gong and the Fukienese man that Cho stored money in small boxes.  Defendant indicated that he helped with the robbery because Gong promised to give him money from their next job.  Defendant explained that he thought the men would have guns, but he did not know that Gong and the Fukienese man would hurt Cho and Sek. Defendant told Marshall that he had lied during his first interview because he was scared when he learned that Cho and Sek had been killed. Defendant wrote out a statement in English commemorating this version of his story.  He signed and dated it May 15th with a time of 5:00 a.m.  This document was also read and admitted into evidence.

At 11:00 a.m. Marshall and Detective Schmittgall entered the room and questioned defendant in English for the next three hours.  Schmittgall first informed defendant that the prior Miranda warnings still applied, including the right to a lawyer, and asked if he wished to talk to them.  Schmittgall testified that

> "I did not read the [Miranda] card . . . . I
> did not read him any questions [from the

card] and ask him to respond to them. I asked
him if he was still willing to speak to us
and he knows the same rights apply as to [a]
lawyer and everything. He said I'm willing to
speak."

Defendant said he was willing to speak to the detectives and then

proceeded to give them a more detailed description of Gong.  At

the conclusion of this questioning the detectives got defendant

food and then they left for the crime scene.

Upon their return to the precinct around 6:00 p.m.,

they learned from another detective that Sek maintained an online

diary and that on the day of the murders Sek made an entry about

defendant.  The entry stated that defendant had arrived at Sek's

apartment asking for fishing poles.  Sek had asked defendant to

remain downstairs, but defendant entered the apartment and stayed

for about an hour, walking around the apartment and smoking

cigarettes.

Marshall and Schmittgall decided to confront defendant

with a story that Sek survived and had told them that defendant

had gone to the apartment looking for the fishing poles.  At 9:00

p.m. on May 15th, they entered the room and interrogated

defendant for approximately the next four hours.  They proceeded

along the lines they had planned, and told defendant a fabricated

story that Sek was in critical condition at the hospital, but was

able to tell them that defendant went to the apartment looking

for something.  They asked defendant what he went to get.

Defendant repeated his prior story that he went looking for Cho

and he also talked about the figurines.  Schmittgall wrote "fishing pole" on a piece of paper and turned it faced down.  He told defendant that he wrote on that paper what defendant went looking for in the apartment.  In response to Schmittgall's questions about whether anyone else was in the room and was Cho present, defendant said he and Sek were alone.  Schmittgall then passed the paper to defendant who turned it over.  Defendant's face flushed.  Schmittgall said no one else could have told him about the poles because defendant admitted no one else was in the apartment.  Schmittgall then told defendant that he knew the intention was not murder and that it was not black and white, that there was more to it and that they needed defendant to explain.

Defendant broke down and cried for approximately 15 to 20 minutes.  The detectives gave him tissues, water and cigarettes.  Once defendant composed himself they told him it was time to explain what happened.  Defendant told them that he went to the apartment to ask for the fishing poles.  Once inside, he was walking around in the apartment and grabbed a knife from the kitchen. He went into Sek's room, held the knife to Sek's throat, and forced him to bind his legs and ankles with tape.  He searched the apartment for money but found nothing.  When Cho came home, he turned out the lights, got behind her, put the knife to her neck and forced her to tie herself up. Sek then "went crazy," and started breaking free, so defendant stabbed

him.  Then, Cho started "going crazy," so defendant stabbed her in the stomach. The detectives asked defendant to tell them something about the incident that no one else would know. Defendant indicated that Cho's door was locked and that he had put the knife in the toilet.  The detectives asked defendant to put his statement in writing, which he did, in English, and then signed and dated it with a time of 12:55 a.m., May 16th.

The detectives briefly left the room.  Upon their return Marshall wrote down a series of questions about specific details of the murder scene and victims that he posed to defendant, to which defendant responded in writing.  Defendant signed the paper at 1:30 a.m., and the detectives again left the room.  They returned a short time later and repeated the process, eliciting answers that defendant arrived in the United States at age 14, and attended U.S. schools. Defendant signed this document at 2:00 a.m. on May 16th.

At 11:02 a.m. on May 16th, an Assistant District Attorney (ADA) attempted to interview defendant on videotape. During the several attempts to explain defendant's right to consult with an attorney before speaking with the police, defendant eventually indicated that he wanted to speak to a lawyer.

As the testimony revealed, defendant spent most of the interrogation in the room, and exited only when he left on May 13th to go home, and on May 15th and 16th to go to the bathroom

or the lunchroom.  At various times he was removed from the room either for a bathroom break, or because the police needed the room to question someone. If they needed the room, defendant was placed in a cell.  Throughout this process he was provided with water, food and cigarettes.  Once he was arrested he was not permitted to leave the room alone.  According to Marshall, during breaks in the questioning defendant would lay back on one of the chairs and put his feet up on another, and then doze off.

The People presented additional evidence to establish defendant's English language skill and understanding of his rights.  The People submitted a report from the New York City Criminal Justice Agency (CJA),[1] prepared at his arraignment, that indicated his age, address, and that he had completed the 11th grade.  A CJA representative testified that the interview must have been conducted in English because the form indicated that defendant was interviewed at Central Booking, and interviews in other languages are conducted at the courtroom, with an interpreter, prior to arraignment.  The People presented testimony from a Corrections Officer who spoke with defendant seven to eight times in English during his incarceration in Riker's Island, in May and June of 2006, three to four months

_____

[1]As relevant here, the CJA conducts "pre-arraignment interviews and makes a release recommendation assessing defendants' likelihood of returning to court" and "notifies released defendants of upcoming court dates to reduce the rate of non-appearance" (New York City Criminal Justice Agency, http://www.nycja.org/).

before the Huntley Hearing.  The People also presented testimony about defendant's understanding of Miranda rights.  Detective Chin testified that defendant had been arrested seven years prior, on an unrelated matter.  At that time, Chin and Wong advised defendant of his Miranda rights in both English and Chinese, and also provided those rights, in writing, in both languages.  Chin stated that he spoke with defendant in English and that he referred both to "lawyer" and "attorney" when reading defendant his rights, and that defendant wrote the word "yes" next to each right and signed the form.  Wong then repeated the warnings in Chinese and defendant responded "yes" in Chinese.

The court denied defendant's motion to suppress, concluding that his statements were voluntary.  The court found that the defendant was not in custody on May 13th, voluntarily returned on May 14th, at which time he was informed of his Miranda rights, and was not in custody until approximately 9 to 9:30 p.m. on the 14th, when he gave statements regarding his involvement in a plot to rob the victims.  The court further concluded that, while defendant "was not totally fluent in English," the evidence of defendant's school attendance in the United States, the testimony from detectives who questioned defendant about the murders and the unrelated prior arrest that they had communicated with him in English without difficulty, and the fact that defendant did not articulate an "inability to comprehend the nature or substance of what was being said to

him," established that "he was able fully to understand the 'immediate import of the warnings' read to him."


III.  DEFENDANT'S CONVICTION AND APPEAL TO THE APPELLATE DIVISION

At trial, several of the officers essentially repeated their testimony from the suppression hearing.  In addition, all of defendant's written statements, including his confession, were admitted into evidence, as was testimony about Sek's online diary entry post on the day of the murders.

There was medical and forensic evidence that Sek and Cho suffered multiple knife wounds and died as a result of sharp force injuries.  Sek was bound with duct tape on the lower shins and calves and a band of masking tape.  Adhesive residue was found on Sek's wrist and neck.  He suffered a five-inch deep stab wound to the neck, and died from loss of blood as a result.  Cho suffered multiple stab and incised wounds of varying depths to her face, neck and torso, including an eight-inch torso wound that perforated her left abdominal wall.  Cho died from the sharp force injuries to her upper body.  Although the knife recovered from the apartment could not be tested because the handle had been submerged in the toilet water, according to the People's expert, the knife could have caused the victims' wounds.

Physical proof of defendant's involvement in the crimes consisted of DNA and fingerprint evidence.  The DNA under Cho's fingernails was a mixture of her DNA and a male contributor's

genetic material.  Based on a comparison of the partial profile that was able to be developed of the male contributor's DNA and defendant's DNA, the People's expert concluded that defendant's DNA profile was consistent with the male DNA found under Cho's fingernails.  Defendant's left palm print matched prints taken from above Sek's bed.  Prints from the middle and pinky fingers of defendant's right hand matched two prints on the core of the duct tape roll found in Sek's bedroom, and two prints on the duct tape on Sek's leg matched defendant's left thumb.  The print on the flashlight battery found in Sek's bedroom also matched defendant's left thumb.

Defendant sought to enter into evidence excerpts from the notes he wrote on May 13th while he was at the precinct, as well as the videotape of his May 16th meeting with the ADA when he invoked his right to counsel.  Defendant claimed that both were relevant to establish that he was subjected to a coercive environment and that his confession was involuntary.  The trial court denied both requests, but said it would permit defendant to admit a still photograph from the videotape.  Defendant declined this offer.

The trial court submitted 14 counts to the jury: six counts of Murder in the First Degree, six counts of Murder in the Second Degree, Burglary in the First Degree, and Attempted Robbery in the First Degree.  The jury returned an initial verdict finding defendant not guilty of counts two (murder in the

first degree during the course of a burglary in the first degree as to Sek), four (murder in the first degree during the course of an attempted robbery as to Sek), and five (murder in the first degree as to Sek and Cho), and guilty of all of the remaining counts, including count eight (intentional murder in the second degree of Sek).

Outside of the jury's presence, the court informed counsel that it would instruct the jury that counts four, five, and eight were inconsistent, and "direct them to go back and continue their deliberations and reconsider their verdict as to those four counts only." Defense counsel objected to "sending them back to redeliberate on counts two, four, five and eight only," arguing that "the jury has obviously had some misunderstandings about the law and how it's applying the facts to the law. We believe they should go back and redeliberate on all of the 14 counts and come out with an appropriate verdict." The court noted the objection, but adhered to its ruling, and resubmitted the four counts to the jury, with the following instructions,

> "I cannot accept those verdicts because they are inconsistent. They are inconsistent. That's counts two, four, five, in which you found the defendant not guilty, and count eight in which you found the defendant guilty of murder two which is the intentional killing of Sek Man Ng. I'm going to direct you to go back into the jury room because I can't accept the verdicts on those four counts only.
>
> "I direct you to deliberate on those four counts only and reconsider your

> verdict on those four counts only. If you
> should need any further instruction on the
> law on those four counts, I will be glad to
> give it to you. Just have a note prepared and
> signed by your foreperson."

After further deliberation, the jury returned guilty verdicts on the resubmitted counts.

The Appellate Division, in a 3-1 decision, affirmed the judgment, as modified, by vacating the convictions and sentences on the second degree murder counts.  The Appellate Division concluded that the hearing court properly denied defendant's motion to suppress his statements to law enforcement officials, and rejected defendant's other claims that the trial court made erroneous and prejudicial evidentiary rulings in violation of his due process rights, and had mishandled the jury verdict in violation of his right to a fair trial (105 AD3d 761, 762 [2d Dept 2013]).

The dissenting justice opined that the confession should have been suppressed, and the videotape and notes admitted as evidence of the involuntariness of defendant's confession. (105 AD3d at 763 [Hall, J.]).  The dissenter granted defendant leave to appeal (21 NY3d 1012 [2013]).  We now affirm.


IV.

On appeal, defendant asserts that the judgment should be reversed and a new trial ordered on the grounds that the People failed to establish that his statements to the police were

voluntary and that he knowingly and intelligently waived his
Miranda rights.  Defendant further argues that reversal is
required because the trial court denied his right to present a
defense by precluding evidence in support of his claim that his
confession was involuntary, and that the judge mishandled the
jury's original repugnant verdict.

The People respond that the record establishes
defendant understood his rights, notwithstanding his lack of
English fluency, and that his statements were not coerced by the
police, but instead made voluntarily by defendant during the
investigatory process.  The People also argue that the trial
court properly exercised its discretion in precluding defendant's
proposed hearsay evidence of his appearance on the videotape and
defendant's handwritten notes from his first day of questioning.


A.   Voluntariness of Defendant's Statements

We are well aware of the potential damaging effect on
our justice system associated with claims of unlawfully procured
inculpatory statements, as well as the need to ensure that our
laws, and the rights and guarantees thereunder, apply fairly,
regardless of the English language skills of persons entering our
courts (see People v Williams, 62 NY2d 285, 289 [1984]).
Therefore, we have assiduously scrutinized allegations, like
those asserted here, that a defendant was not apprised of the
rights applicable to those in custody or had little capacity to

fully comprehend rights afforded under our laws, or that a defendant succumbed to pressures associated with a coercive environment (see e.g. People v Guilford, 21 NY3d 205 [2013]; People v Anderson, 42 NY2d 35, 38 [1977]).  While defendant makes a compelling case that the police were intentionally dilatory in delaying his arraignment and thus prolonged his detention, we cannot say, based on the totality of the circumstances and as a matter of law, that his statements were involuntary.

It is the "People's heavy burden" (People v Holland, 48 NY2d 861, 862 [1979]) "to prove beyond a reasonable doubt that the statements of a defendant they intend to rely upon at trial are voluntary" (People v Thomas, 22 NY3d 629, 641 [2014]).  In order to assess the voluntariness of defendant's statements, a court must consider the totality of the circumstances because "[a] series of circumstances may each alone be insufficient to cause a confession to be deemed involuntary, but yet in combination they may have that qualitative or quantitative effect" (Anderson, 42 NY2d at 38, citing People v Leyra, 302 NY 353, 363 [1951]).  Statements must not be "products of coercion, either physical or psychological" (Thomas, 22 NY3d at 641), meaning that they must be the "result of a 'free and unconstrained choice by [their] maker' " (id., quoting Culombe v Connecticut, 367 US 568, 602 [1961]).  A court's determination that a defendant's confession is voluntary is a mixed question of law and fact (see In re Jimmy D., 15 NY3d 417, 423 [2010]; People

v Scott, 86 NY2d 864, 865 [1995]).  Our review is limited to
whether record support exists for the court's resolution of
factual questions underlying the court's totality of the
circumstances assessment, including any reasonable inferences
drawn therefrom (id.; see People v McRay, 51 NY2d 594, 601
[1980]), unless we determine, as a matter of law, that the "the
proof [does not meet] the reasonable doubt standard at all"
(Anderson, 42 NY2d at 39).

Defendant argues that the voluntariness of his
statements must be considered in light of the confinement
conditions he was exposed to during his lengthy detention and the
unjustified prearraignment delay following his arrest.  This
Court has stated that "an undue delay in arraignment should
properly be considered in assessing the voluntariness of a
defendant's confession" (People v Ramos, 99 NY2d 27, 35 [2002]),
and may serve as "a significant reason why [a] defendant's
confession could not be considered voluntary" (id. at 35, citing
Anderson, 42 NY2d at 39; Holland, 48 NY2d at 862-863 [delay in
arraignment is "one factor to be considered in assessing the
voluntariness of a confession"]).  To be clear, the overriding
concern is not with the mere fact that a delay has transpired,
but rather with the affect of an unnecessary time lag between
arrest and arraignment on a defendant's ability to decide whether
to speak and how to respond to questioning.  Thus, while
unwarranted prearraignment delay is a "suspect circumstance,"

(Holland, 48 NY2d at 862), the Court has acknowledged that "except in cases of involuntariness, a delay in arraignment, even if prompted by a desire for further police questioning, does not warrant suppression" (Ramos, 99 NY2d at 35, citing People v Dairsaw, 46 NY2d 739, 740 [1978]; Anderson, 42 NY2d at 39; People v Johnson, 40 NY2d 882, 883 [1976]; People v Alex, 265 NY 192, 194 [1934]; People v Malinski, 292 NY 360, 371 [1944]; People v Elmore, 277 NY 397, 404 [1938]; Holland, 48 NY2d at 862-863). Thus, a court must give careful consideration to a delay that impacts a defendant's resistance by extending exposure to the pressures of interrogation to the point where a defendant's will bends to the desires of the interrogators, or during which a defendant is led to believe that the only way to end interrogation is by bargaining away legal rights.

Here, defendant claims that the 28-hour delay in his arraignment was unnecessary, and intended to keep defendant for further interrogation in order to extract a confession and other inculpatory statements. He contends that this unjustified prolonged delay is further proof that his confession was involuntary, and must be suppressed. Defendant relies on CPL 140.20 (1) in support of his argument that police must take immediate steps to assure prompt arraignment, and that they failed to do so in his case.

That section provides, in relevant part, that

"[u]pon arresting a person without a warrant, a police officer, after performing without

> unnecessary delay all recording,
> fingerprinting and other preliminary police
> duties required in the particular case, must
> . . . without unnecessary delay bring the
> arrested person or cause him to be brought
> before a local criminal court and file
> therewith an appropriate accusatory
> instrument charging him with the offense or
> offenses in question"

(CPL 140.20 [1]). Although "the Legislature did not set rigid temporal limits in enacting CPL 140.20 (1); nor do we in construing it . . . the statute requires that a prearraignment detention not be prolonged beyond a time reasonably necessary to accomplish the tasks required to bring an arrestee to arraignment" (People ex rel. Maxian on Behalf of Roundtree v Brown, 77 NY2d 422, 427 [1991] [internal quotation marks omitted]). The Court has recognized that suppression is but one appropriate remedy for a violation of this statute, where the delay is unrelated to facilitating arraignment and "affect[s] the voluntariness of a confession" (Ramos, 99 NY2d at 36, citing Holland, 48 NY2d at 862-863).

The People argue, as they did before the suppression court and the Appellate Division, that the delay here was for a valid investigative purpose. The People assert that the police needed defendant's assistance because he was the only person who could identify Gong and the Fukienese man. Therefore, any delay in arraignment was necessary and appropriate.

As a threshold matter, we reject any suggestion that the statute provides a per se "ongoing investigation" exception

to its clear mandate that a person subject to a warrantless arrest be arraigned without unnecessary delay.  The statutory text lends no support for such a sweeping and unlimited exemption.  Significantly, there is no reference to investigations in the list of categorized exclusions to the prompt arraignment requirement set forth in CPL 140.20 (1) (CPL 140.20 [2], [3]).  In fact, the only reference to ongoing investigations is found in CPL 140.20 (7), which states that

> "[u]pon arresting a person . . .  without a warrant, a police officer shall, upon the arrested person's request, permit [such person] to communicate by telephone  . . . for the purposes of obtaining counsel and informing a relative or friend that [the person] has been arrested, unless granting the call will compromise an ongoing investigation or the prosecution of the defendant."

As this paragraph illustrates, the Legislature knew to include language so as not to imperil an ongoing investigation or prosecution of a defendant.  The absence of similar language in CPL 140.20 (1) suggests that an investigation cannot serve as an automatic excuse for open-ended questioning solely intended to undermine the very rights protected by the statute (see McKinney's Cons. Laws of N.Y., Book 1, Statutes § 240 ["where a statute creates provisos or exceptions as to certain matters the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned'"]).  As this Court has stated, section 140.20 "is designed to protect against unlawful confinement and assure that persons accused are advised

of their rights and given notice of the crime or crimes charged" (Ramos, 99 NY2d at 36). A per se rule that a delay associated with an investigation can never be unnecessary, regardless of the circumstances, would undermine the salutary goals of CPL 140.20 (1).

Instead, a delay for investigatory purposes is treated the same as any other prearraignment delay: "one factor in assessing the voluntariness of a confession" (Holland, 48 NY2d at 863). That is not to say that a delay under the guise of an investigation, which yields no more than a defendant's inculpatory statements, and was intended solely to prolong detention just long enough to secure a confession, should be considered the equivalent to a delay caused by purely ministerial or administrative tasks. For where the intent is to overbear the will of an individual, and the results prove successful, prearraignment delay cannot be tolerated.

Given the inordinate length of time between defendant's arrest and arraignment and the unsupported claims of an investigatory need to continue the questioning following his arrest, we have no difficulty concluding that the record lacks support for a finding that the delay was necessary. Here, defendant was arrested at 9:00 p.m. on May 14th, after 10 hours of intermittent questioning at the precinct. Over 12 hours later, he made an oral confession, at approximately 9:30 p.m. on May 15th, and completed a signed written confession 4 1/2 hours

later, at 2:00 a.m.  He was then arraigned more than 28 hours
after his arrest, in excess of the 24-hour delay this Court
determined to be presumptively unnecessary in People ex rel.
Maxian.

Although the People claim that the police held over
defendant because they needed his help in apprehending Gong and
the Fukienese man, they fail to explain why the police continued
to detain and question defendant without arraignment after he
provided a description of the men and where he met Gong,
discussed his conversations with Gong, described the plans for
the out-of-state crime, and reviewed all the police photographs
collected as a result of the police investigation.  The People do
not state what other information the police hoped to obtain that
would have aided their search for these two men or in their
efforts to prevent a future crime.  We are particularly concerned
about the undefined outer limits of this investigation. Taken to
its logical conclusion, the People's argument would permit the
police to detain defendant incognito, for as long as it takes to
locate the two men.  A delay without end in sight, of course, is
exactly what our cases and CPL 140.20 (1) do not permit (see
Holland, 48 NY2d 861; Dairsaw, 46 NY2d 739; CPL 140.20 [1]
[(u)pon arresting a person without a warrant, a police officer .
. . must . . . without unnecessary delay bring the arrested
person . . . to be brought before a local criminal court"]).

Even if we accepted the People's argument that some

delay for the investigation into Gong and the Fukianese man was appropriate, we would still conclude that there was unnecessary prearraignment delay. According to the People, the police began actively searching for these two men after defendant told his story inculpating them in the murders during his interrogation between May 14th at 9:30 p.m. and 1:00 a.m on May 15th. When Detectives Marshall and Schmittgall learned of Sek's blog at 6:00 p.m. on May 15th, they turned their focus to defendant as a suspect in the murders and developed a plan to extricate information from him. At that point, the detectives continued defendant's confinement and interrogation until he signed his confession at 2:00 a.m. According to the record, by then all the police had done was complete an online booking form, hardly the type of efforts intended to ensure the prompt prearraignment required by CPL 140.20.

We now consider whether, given this undue delay, the People have established the voluntariness of defendant's statements. Although the cumulative length of defendant's detention and the undue prearraignment delay are troubling, we cannot say, as a matter of law, that the People failed to meet its burden of proving beyond a reasonable doubt that defendant's confession was voluntary. Nor, on this mixed question of law and fact, is the record devoid of support for the Appellate Division's determination of the underlying factual questions regarding defendant's detainment and interrogation.

Defendant claims his statements were the product of exhaustion and psychological pressures that made him feel helpless, and that his only hope for relief was to confess. He points to the fact that he was intermittently interrogated at the precinct by several officers over the course of four days, in a small, windowless room with no bed, where he was confined and held for over 24 hours after his arrest until he broke down and confessed to the double murders. Despite defendant's advocacy that his confession was involuntary, we are unpersuaded that his case shares the characteristics common to those in which this Court has determined that a coercive environment impacted on the voluntariness of a defendant's statements. Those cases typically involved deprivation of food, water, and sleep during the course of a prolonged interrogation, with defendants confined and isolated from all but law enforcement personnel, and on occasion they were led to believe that they had to bargain for their right to counsel. As a consequence, defendants in those cases often demonstrate emotional and physical breakdowns.

For example, in People v Holland, the defendant's pre-arraignment detention lasted 48 hours, over three different days, during which he was subjected to what the Court characterized as "prolonged and vigorous interrogation," and the defendant languished in a cell between periods of questioning (48 NY2d at 863). Moreover, defendant was induced to make inculpatory statements because he "was led to believe that if he

confessed he would not be incarcerated, nor returned to Louisiana on an outstanding fugitive warrant, but rather would be assigned to a mental facility" (id.).  The Assistant District Attorney in fact dissuaded defendant from exercising his right to counsel. In People v Anderson (42 NY2d 35), a 19-hour interrogation was conducted "in relays" by a total of eight or nine officers operating in teams.  The detention was continuous, and the defendant was confined, incommunicado, to a windowless interview room, without food, and deprived of sleep, with the officers actively waking him when he dozed. He was not apprised of his right to counsel for over 13 hours (id. at 39-41).  In Guilford, the defendant was detained for 49 1/2 hours, often in a 10 x 10 windowless room, without a clock (21 NY3d 205).  He was under observation the entire time, and the interrogations were conducted by various officers, in rotation. There was no direct evidence that he had slept or eaten.  The officers described the defendant on the second day of interrogation as appearing defeated and that he had "given up" (id. at 210). The defendant confessed in exchange for a lawyer, who finally met with him after three days.  At that time, the lawyer described defendant as emotional and distraught (id. at. 211).

Defendant here was not subjected to the type of deprivations and psychological pressure described in Holland, Anderson  and Guilford.  Although defendant was detained for over 24 hours, and spent most of the time in a windowless room, his

basic human needs were provided for because he was able to eat, drink, and take bathroom breaks.  He was even allowed to smoke cigarettes.  Unlike the tactics used in Anderson and Guilford, the interrogations were not done in continuous rotations, but rather were intermittent, and provided breaks during which defendant was able to rest and sleep, as well as remain silent and consider his situation.  Defendant was not placed in the untenable position of bargaining his rights as in Holland and Guilford, as he was neither induced to confess in order to speak with a lawyer, nor dissuaded from exercising his rights to counsel or to remain silent.  Instead, as the detectives testified and the Miranda form indicates, defendant was informed of his rights early during the interrogation process.  The record establishes defendant confessed only once he was faced with evidence of his guilt, not because he was exhausted and desperate to escape his interrogators.  Thus, the totality of the circumstances here do not "bespeak such a serious disregard of defendant's rights, and were so conducive to unreliable and involuntary statements, that the prosecutor has not demonstrated beyond a reasonable doubt that the defendant's will was not overborne" (Holland, 48 NY2d at 863).

Defendant further contends that his statements cannot be considered voluntary because the People failed to establish that he knowingly waived his Miranda rights, notwithstanding his lack of English language fluency.  Defendant argues that he is a

Chinese immigrant with severely limited English language skills.
As a consequence, he claims he was unable to understand the
meaning of his rights because they were provided only in English,
a fact obvious from the videotaped interview illustrating his
ignorance of the meaning of the word "attorney" and the concept
of the "right to remain silent," as well as his overall
difficulty in speaking with the ADA.

A defendant's waiver of his <u>Miranda</u> rights must be
knowing, voluntary, and intelligent (<u>Miranda v Arizona</u>, 384 US
436, 444 [1966]; <u>People v Dunbar</u>, 24 NY3d 304, 314 [2014]).
Defendant is correct that if his English language comprehension
was so deficient that he could not understand the import of his
rights, his confession could not have been voluntary
(<u>see</u> <u>Williams</u>, 62 NY2d at 289).  However, whether defendant's
waiver was knowing and intelligent is "essentially a factual
issue that must be determined according to the circumstances of
each case" (<u>id.</u> at 288). The People must establish that the
defendant "grasped that he or she did not have to speak to the
interrogator; that any statement might be used to the subject's
disadvantage; and that an attorney's assistance would be provided
upon request, at any time, and before questioning is continued"
(<u>id.</u> at 289).  "[W]here the facts are disputed, where credibility
is at issue or where reasonable minds may differ as to the
inference to be drawn from the established facts, this court,
absent an error of law, will not disturb the findings of the

Appellate Division and the suppression court" (People v McRay, 51 NY2d 594, 601 [1980]). Here, there is record support for the lower courts' determinations that defendant understood the import of his Miranda rights.

At the suppression hearing Detectives Wong, Marshall, and Schmittgall testified that they spoke to defendant in English and he responded in kind, that he had no difficulty communicating in English, and never "articulated an inability to comprehend the nature or substance of what was being said." Detective Marshall testified that he read defendant his rights in English from a pre-printed Miranda warning sheet, and that defendant did not request clarification or express any misunderstanding of the rights. Defendant's statements--concerning Gong and his confession--are written by his own hand in English, albeit with not insignificant grammatical errors. The People also presented evidence that defendant went to school in the United States for seven years; during a prior arrest on an unrelated matter he was provided Miranda warnings in both English and Cantonese; and he spoke in English after his arraignment with an intake agent from the CJA. He also spoke in English with a Corrections Officer during his detainment at Riker's Island after his arrest for Cho and Sek's murders. This evidence provides record support for the hearing court's finding, affirmed by the Appellate Division, that defendant, while not totally fluent in English, was able to understand the import of the Miranda warnings.

The fact that the opposite conclusion was just as plausible, based on defendant's limited schooling and presence in the United States and his apparent inability to fully appreciate the ADA's questions, as well as his lack of understanding of how and whether to invoke specific <u>Miranda</u> rights to remain silent and speak with a lawyer, involves inferences based on the factual questions regarding his limited language fluency, and does not provide a basis for us to conclude that the lower courts erred as a matter of law.  Defendant's attempt to portray his case as an example of unlawful police interrogation tactics deployed to take advantage of his limited understanding of English is simply not borne out on this record.

   B.   <u>Evidentiary Rulings on Videotape and Notes</u>

Defendant argues that the trial court erroneously precluded admission of the videotape of defendant's meeting with the ADA and excerpts from his May 14th notes, in violation of defendant's due process rights to a fair trial and to present a defense.   Defendant argues that the videotape and notes establish his physical and emotional state during the interrogation.

The well-established rule is that "all relevant evidence is admissible unless its admission violates some exclusionary rule" (<u>People v Scarola</u>, 71 NY2d 769, 777 [1987]). Evidence is relevant if "it tends to prove the existence or

non-existence of a material fact, i.e., a fact directly at issue in the case" (People v Primo, 96 NY2d 351, 355 [2001]; Scarola, 71 NY2d at 777).  A court, in its discretion, may exclude relevant evidence if "its probative value is substantially outweighed by the potential for prejudice" (People v Mateo, 2 NY3d 383, 424 [2004]), trial delay, or the potential to mislead or confuse the jury (Primo, 96 NY2d at 355).  However, a "court's discretion in evidentiary rulings is circumscribed by the rules of evidence and the defendant's constitutional right to present a defense" (People v Carroll, 95 NY2d 375, 385 [2000]).  Nevertheless, "[t]he right to present a defense . . . does not give criminal defendants carte blanche to circumvent the rules of evidence" People v Hayes, 17 NY3d 46, 53 [2011], quoting United States v Almonte, 956 F2d 27, 30 [2d Cir 1992] [internal citation and quotation marks omitted]).

Evidence concerning the voluntariness of the confession was relevant as the confession was a key piece of the People's evidence establishing his guilt.  However, it is undisputed that the videotape was hearsay and thus inadmissible unless it came within one of the hearsay exceptions.  Defense counsel represented to the court that he intended to introduce the videotape for the nonhearsay purpose of establishing defendant's appearance after the interrogation during the morning of May 15th, as a response to the People's admission of defendant's May 16th booking photograph.  Notwithstanding defense counsel's

assertions regarding his intended use of the videotape, he declined an offer to admit a still photograph from the videotape. Under these circumstances, we cannot say that the court abused its discretion in denying admission of the videotape, given that a still photograph would have served defendant's purpose of presenting the jury with evidence of his physical appearance on May 15th, and also avoided any potential confusion or misdirection created by the jury's consideration of defendant's linguistic skills based on the audio component of the video. This would be a different case if counsel offered the videotape to show defendant's lack of English proficiency and inability to appreciate the English language version of the <u>Miranda</u> warnings given by the ADA (<u>see</u> <u>Williams</u>, 62 NY2d at 289).  However, defense counsel explicitly and repeatedly said that was not his intended purpose.

We also reject defendant's argument that the court erred in excluding excerpts from his handwritten notes, prepared by the defendant during the first day of questioning at the precinct, and proffered as evidence of his state of mind and the coercive environment that led to his involuntary confession. To the extent the excerpts where defendant claims he was "imprisoned for the whole day" and that is how "American police do" were offered by for their truth, to establish his confinement, these statements are inadmissible hearsay.  Contrary to defendant's arguments, they do not contain complaints to anyone within the

meaning of the prompt complaint exception (see People v Alex, 260 NY 425, 428 [1933] ["evidence that the defendant() made (a) complaint (of abuse) when arraigned should have been" admitted]). Alternatively, even as evidence of defendant's state of mind, the statements were of limited probative value because they were written based on defendant's experience the first day, when he was not a suspect and before he went home, saw his family, and rested. They do not shed light on how he was treated after he returned to the precinct on May 14th. Nor, do they provide information about his state of mind at the time he confessed to the murders or made inculpatory statements about his role in the robbery.  Therefore, the court did not abuse its discretion by precluding this small number of excerpts, while recognizing defendant would have the opportunity to cross examine the police in support of his claim that the defendant was subject to a coercive environment.


## C.  Repugnant Verdict

Defendant argues that the initial verdict was repugnant and required that the court resubmit to the jury all of the counts rather than a selected few.  Defendant's general statement at trial that all the counts should go back to the jury because the jury "had some misunderstandings about the law and how it's applying the facts to the law" did not preserve any specific challenge to the verdict that he now asserts on appeal (see

People v Carter, 7 NY3d 875, 876 [2006] [counsel failed to
challenge the verdict as repugnant]; People v Robinson, 88 NY2d
1001, 1002 [1996] [to "preserve a question of law reviewable by
this Court, an objection or exception must be made with
sufficient specificity at the trial"]).  Defendant's alternative
argument that the court impermissibly communicated its view of
the evidence is essentially a challenge to the court's
instructions to the jury.  However, defense counsel did not
object to that instruction, and therefore the argument is
unpreserved.[2]

Accordingly, the Appellate Division order should be
affirmed.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed.  Opinion by Judge Rivera.  Judges Pigott, Abdus-
Salaam, Stein and Fahey concur.  Chief Judge DiFiore and Judge
Garcia took no part.

Decided February 18, 2016

---

[2] Defendant has not preserved the argument, and we do not
reach the question, whether CPL 310.50 mandates resubmission of
all counts, including those deemed not inconsistent, upon the
finding of any defect.