People v Jian Qun Hunag (2024 NY Slip Op 50611(U))

[*1]

People v Jian Qun Hunag

2024 NY Slip Op 50611(U)

Decided on May 21, 2024

Supreme Court, Queens County

Cheng, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 21, 2024
Supreme Court, Queens County

The People of the State of New York,

against
Jian Qun Hunag, AKA JIAN QUN HUANG, Defendant(s).

Indictment No. 73147/2023

Defendant by: Mani Constantine Tafari, Esq., Queens Defenders, 118-21 Queens Boulevard, 2nd Floor, Forest Hills, NY 11375
The People by: Melind Katz, Queens County District Attorney, by ADA Sean Keith Jaime, Esq., 125-01 Queens Boulevard, Kew Gardens, NY 11415

Leigh K. Cheng, J.

Defendant is charged by indictment with Criminal sexual act in the third degree (Penal Law § 130.40 [2]) and other charges. A Huntley/Dunaway hearing was ordered regarding the defendant's videotaped statement made to Detective Daniel Cruz at the 112th Precinct.
Such hearing was held before this court on April 29, 2024. Based on a review of the court file, the testimony elicited and evidence presented at the hearing, the court considered two suppression issues: possible improprieties in the circumstances leading to the post-Miranda interrogation and defendant's contention that he lacked sufficient language comprehension to allow an effective waiver of his Miranda rights.
Findings of Fact
The People called one witness, Detective Daniel Cruz, who testified that he has worked for the NYPD for approximately 19 years and has been assigned to the Special Victims Squad for approximately seven of those years, where his duties involve investigating sexual crimes.
On June 5, 2023, Det. Cruz was assigned to investigate a sexual abuse case received from an immediate response team (hereinafter "IRT"), which was reported through a child abuse hotline. The report stated that a female complaining witness (hereinafter "CW"), who was 15 at the time of the incidents, was allegedly being sexually assaulted by her father. The reporting [*2]person spoke first with Det. Cruz and his partner, Detective Machtel, and advised them that the man's wife had suspected that something was going on between her husband and their daughter. Thereafter, they spoke with the CW, who stated to them that her father, defendant herein, touched her on two specific occasions that she was able to recall while at their shared residence. On one incident, in October 2020, he pulled down his pants, got on top of her and rubbed his penis on her vagina over her clothing. On the second incident, on November 14, 2020, he performed the same act and also placed his mouth on her vagina.
Det. Cruz further testified that defendant was called into the precinct and brought into a six-by-six-foot video interrogation room furnished with a table and two chairs. Defendant was not handcuffed and Det. Cruz was not armed during the interview. The exchange between the two was recorded and such video recording was entered into evidence as People's Exhibit 1. The interview begins at 11:40 p.m. and ends at 12:07 a.m. Same begins with Det. Cruz introducing himself and explaining that he is investigating defendant's case. Det. Cruz then obtained defendant's pedigree information, and thereafter instructed that he will be reading defendant his Miranda rights and then will be asked if he understands. Defendant can be heard saying "can you explain a little bit?"[FN1]
Det. Cruz then explained again he would be reading defendant his rights and will ask whether he understands each one, and then made the following statements, read from a four-by-four card, and asked if he understood after each: that he had the right to remain silent and refuse to answer questions; that anything he says may be used against him in a court of law; that he has the right to consult an attorney before speaking with police and to have one present during questioning now or in the future (defendant asked him to repeat this right); that if he cannot afford an attorney, one will be provided to him without cost; and that if he did not have one, he has the right to remain silent until he can consult with one. Defendant stated in the affirmative after each statement that he understood. Det. Cruz then asked, "now that I have advised you of your rights, are you willing to answer questions?" to which defendant replied "yes." After each warning, defendant indicated that he understood same. Thereafter, defendant agreed to speak with Det. Cruz about the allegations made in the IRT. The statements per the 710.31(1)(a) notice are those recorded in the videotape in evidence. 
On cross-examination, Det. Cruz indicated that he did not provide definitions of certain words contained within Miranda warnings, to wit: right, attorney, opportunity, and counsel. A translator was not requested on defendant's behalf. Furthermore, there were points in the interview when he was "searching" for the proper English word to use. Finally, Det. Cruz indicated, as an example, that he only speaks Spanish to Spanish-speaking defendants if they request it.
Once the People rested, defendant was called to testify. Defendant was born in China and came to the United States in November 2008 and worked for Carnival cruises for two years and has, for the most part, lived in the U.S. since that time. He has spoken Mandarin his whole life. In June 2023, he was working both as a tutor for a driving school for Chinese students and as an Uber driver. Thus, the use of English was not required to perform his work.
Defendant testified that during the interrogation when Det. Cruz read defendant his Miranda rights, he did not know the content of the rights nor did he understand them. He did not [*3]know the meaning of the word "counsel." Notwithstanding, he continued talking to the detective because he "looked serious" and he did not want to upset him if he kept silent. He also wanted to know what happened to his wife and family members. He explained that the reason he stated that he felt guilty and that he knew he did something wrong was because he had limited use of English words. To that end, he stated that he did not think he was doing a good job as a father in terms of their education. He recalls that, as a driving instructor, he saw the words "plead guilty" often on tickets issued to his students and used the word "guilty" in order to express his remorse for not being able to be a better father.
Defendant testified that on the day of the interrogation he was driving an Uber fare in Manhattan when he received a phone call at 10:42PM from Detective Cruz who "told me to go to 112 [precinct] police station immediately to pick up my family members home." He further testifies "it was very weird to me. I was thinking, what happened . . . I asked the detective what happened. The detective didn't tell me the reason." Defendant further testifies "I was trying to call my wife and my oldest daughter, but no one picked up." Such failure to answer their phones was "super rare" and "I became more and more worried and scared." 
On cross-examination, he indicated that, though he spoke with Det. Cruz in the interrogation room for nearly 30 minutes, he had a limited vocabulary and could not use the correct words to express himself; nor did he understand the vocabulary words his daughter used when talking to him. He also explained that certain words he used were not appropriate for what he was trying to express. Further, to the extent he used words like "relationship, psychological behavior, puzzled, cultural background, secretive, dark history, conflicting," he is unsure that they were the appropriate words to use to convey what he intended, but since he knew the words, he thought he could use them.
Conclusions of Law
At a Huntley hearing, the People bear the burden of establishing beyond a reasonable doubt the voluntariness of a defendant's statement (see People v Witherspoon, 66 NY2d 973 [1985]; People v Holland, 48 NY2d 861 [1979]; People v Anderson, 42 NY2d 35 [1977]; People v Huntley, 15 NY2d 72 [1965]; People v Loucks, 125 AD3d 890 [2d Dept 2015]). Once that burden is satisfied, the burden of persuasion to show otherwise is on the defendant (see People v Johnson, 139 AD3d 967 [2d Dept 2016]; People v Santos, 112 AD3d 757 [2d Dept 2013]). Generally, the test for determining voluntariness is by viewing the totality of the circumstances (see Anderson, 42 NY2d at 38; Johnson, 139 AD3d at 969-70).
A waiver of Miranda rights must be knowing, voluntary, and intelligent (see Miranda v Arizona, 384 US 436 [1966]; People v Jun Cheng Lin, 26 NY3d 701 [2016]). A defendant's statements will be considered voluntary "so long as the immediate import of those warnings is comprehended" (People v Williams, 62 NY2d 285 [1984]); they need not be understood in the abstract (see People v Alexandre, 215 AD2d 488 [2d Dept 1995]).
The court first addresses the defendant's testimony of the events leading to his arrival at the precinct. Defendant testified that he received, while working, an unsolicited call from Det. Cruz advising him to go to the precinct to pick up his family. The videotape of the ensuing interrogation does not record any reference to the purpose of the interrogation other than a preliminary statement before Det. Cruz reads the defendant his Miranda rights that they are there to discuss "your case" in reference to the defendant. The testimony of both witnesses at the [*4]hearing is otherwise devoid of reference to other preliminary information, if any, provided to defendant regarding the purpose of the interrogation. 
Thus, at least within the confines of the record of the suppression hearing, it appears defendant may not have known the true subject of his interrogation until after he waived his Miranda rights. Thus, the first question: does such omission neutralize the subsequent Miranda waiver, if otherwise valid? The law is, in fact, clear — it does not. It has been clearly held there is no obligation to advise a defendant of the subject of the impending interrogation and such omission in no way invalidates the Miranda warnings that may follow. The Second Department has explicitly stated as such: "Before questioning, the police were under no obligation to inform the defendant of the specific crime they were investigating" prior to a Miranda waiver (see People v Myers, 17 AD3d 699 [2d Dept App Div 2005]). Such decision cites the U.S. Supreme Court where a defendant signed a Miranda waiver after his arrest for interstate transportation of stolen firearms but the subsequent brief interrogation included the topic of his alleged shooting of an individual unrelated to such charges — the court then found "mere silence by law enforcement officials as to the subject matter of an interrogation" neither amounts to coercion or "'trickery' sufficient to invalidate a suspect's waiver of Miranda rights" (see Colorado v Spring, 479 US 564 at 576 [US Sup Ct, 1987]). Such Court elaborated its rationale: "the Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege" but instead "the Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect" (see Colorado v Spring, 479 US 564 at 574).
However, equally clear is that recitation of the Miranda rights and an explicit waiver does not forestall all challenges to its validity. "Physical coercion" or any "improper conduct or undue pressure which impaired the defendant's physical and mental condition . . . undermining his ability to make a choice" to make a statement is equivalent to an "involuntarily made" statement, statutorily recognized as barred (see CPL 60.45[2]). A detective who denied a defendant's request to lower his hospital bed to alleviate physical pain a few hours removed from surgery under the influence of painkillers and with an oxygen mask, removed for clearer answers, was such an example where the subsequent Miranda waiver and interrogation was barred as anathema to voluntariness (see People v Parker, 224 AD3d 777 [App Div 2d Dept 2024]).
Additionally: "Certainly, if the Miranda warnings were preceded by statements that were directly contrary to those warnings (e.g., you are required to answer our questions; your statements will be used to help you; you are not entitled to a lawyer) there would be no need to examine the totality of the circumstances to determine if a Miranda waiver was knowing, voluntary and intelligent" (see People v Dunbar, 24 NY3d 304 at 316 [Ct Appeals 2014]). Thus, "the detective's pre-warning statements that the Miranda warnings did not 'mean anything' and were 'just part of the process,' viewed in conjunction with the defendant's unresolved confusion as to whether he could answer the detectives' questions . . . " constituted such a subversion (see People v Galvez-Marin, 225 AD3d 622 [App Div 2d Dept 2024]) Also, subtler forms subverting the explicit meaning contained in Miranda will similarly render a subsequent waiver invalid. A "preamble" read directly before a Miranda warning that included statements such as "If you have an alibi, give me as much information as you can, including the names of any people you were with" and "If there is something you need us to investigate about this case you have to tell us now so we can look into it" (see People v Dunbar at 309) was found to "undercut [*5]the meaning of all four Miranda warnings, depriving [defendants] of an effective explanation of their rights" (see People v Dunbar at 316). 
Here, without coercion or misleading statements, no such basis exists to question the validity of the Miranda waivers of the defendant that followed. 
Finally, the court notes that "'trickery' does not make it impossible per se to find that a defendant voluntarily waived his rights" (see U.S. v Anderson, 929 F2d 96 at 99, [US Ct Appeals 2d Cir 1991]) but the relevant inquiry is if "the defendant's will was overborn by the [authorities] conduct" (see U.S. v Anderson, 929 F2d 96 at 99) — that such trickery has vitiated the freedom of the defendant to knowingly and voluntarily choose to waive his Miranda rights. An undercover agent posing as a cellmate whose conversation leads to incriminating statements is such allowable "trickery" as the agent was "viewed the cellmate-agent as an equal and showed no hint of being intimidated by the atmosphere of the jail. In recounting the details of the [victim's] murder, respondent was motivated solely by the desire to impress his fellow inmates. He spoke at his own peril" (see Illinois v Perkins, 496 U.S. 292 at 298 [U.S. Sup Ct 1990]). Likewise, statements by a detective prior to interrogation and a Miranda warning that "he knew defendant was involved in the crime, stating 'point blank' that the evidence against defendant was strong, including videotape and eyewitness evidence . . . to take advantage of 'your chance' to speak before the other suspects implicated him" (see People v Rutledge, 116 AD3d 645 at 645 [App Div 1st Dept 2014]) was allowable trickery as there was no indication the defendant's will was "overborne". However, where, prior to a written Miranda warning provided to defendant, the detective referred to the form as a "bullshit form" to the defendant and later testified such comments were intended to "downplay" and "minimize its importance", such statements "undermined the Miranda warnings and rendered them ineffective" (see People v Alfonso, 142 AD3d 1180 [App Div 2d Dept 2016]). 
It is this category where the court may at least consider an application here but, as quickly, can turn to its rejection. Again, at least within the available record of the hearing, the defendant in testimony the court credits relayed a narrative where he was told, not of any interrogation, but of a need to retrieve his family, perhaps a means by Det. Cruz to ensure his appearance. Whether an unintentional misstatement or a deliberate ruse by Det. Cruz, the relevant inquiry is whether, at the time of his Miranda warning, the defendant could freely choose to waive such rights. While, arguably, trickery may have been invoked to bring the defendant to the precinct, in regards to his waiver, it is of no moment — when addressed with such rights, the defendant freely chose to waive them. 
Now turning to the defendant's contention that his statements contained in the CPL § 710.30 (1) (a) notice were involuntary as the People have not established beyond a reasonable doubt that defendant had sufficient comprehension during his English-only interrogation to knowingly waive his Miranda rights, the court finds otherwise. 
Statements will not be considered voluntary if a defendant's English language comprehension is "so deficient" that they could not understand such import (Jun Cheng Lin, 26 NY3d at 725). Here, under the totality of the circumstances, this court finds that the People met their burden of establishing that defendant understood the immediate import of the Miranda warnings and that he validly waived those rights, and defendant failed to demonstrate otherwise. Det. Cruz and defendant spoke English for nearly 30 minutes, and the latter's responses were consistent with the questions asked, demonstrating a sufficient command of the English language (see People v Moreno, 148 AD3d 827 [2d Dept 2017]). While defendant may have asked for an [*6]explanation prior to Det. Cruz having administered the warnings, this was before they were even issued (the warnings were then immediately read to him slowly), and the fact that defendant asked Det. Cruz to repeat one of the warnings does not infer that same was not understood (see People v Acuna, 145 AD2d 427 [2d Dept 1988]). Indeed, defendant indicated that he understood each warning after he was asked and then willingly proceeded to speak to the detective (see People v Sirno, 76 NY2d 967 [1990]; People v Tineo, 144 AD2d 507 [2d Dept 1988]). Defendant never asked for clarification; he never asked for a translator or to hear the warnings in Mandarin; he never indicated that he did not understand the words the detective was saying or asked the detective to define those words; he never stated that his understanding of English was limited; and Det. Cruz did not under all these circumstances feel the need for an interpreter (see People v Mao-Sheng Lin, 50 AD3d 1251 [3d Dept 2008]; People v Ortega-Flores, 70 Misc 3d 60 [Sup Ct, App Term, 2d Dept, 9th and 10th Jud Dists 2020]; cf. Santos, 112 AD3d at 758; People v Sirno, 151 AD2d 621 [2d Dept 1989]). The law simply does not require total fluency (see Jin Cheng Lin, 26 NY3d at 726; People v De Los Santos, 49 AD3d 550 [2d Dept 2008]). Thus, the court finds that the defendant received adequate warnings and validly waived his rights.
Further, there is no Dunaway basis to suppress defendant's statements since Det. Cruz spoke with the CW, who provided the requisite level of intrusion needed in order to interrogate defendant, and Det. Cruz confirmed defendant's identity, and told him that he was investigating his case, which was followed by the issuance of Miranda warnings (see People v Starr, 221 AD2d 488 [2d Dept 1995]; People v Gonzalez, 138 AD2d 622 [2d Dept 1988]).
Accordingly, suppression of statement evidence is denied.
Dated: May 21, 2024
Kew Gardens, New York
Leigh K. Cheng, J.S.C.

Footnotes

Footnote 1:Defense counsel inquired of the detective if he heard the former's client say "Chinese please" to which the latter responded that "[t]o me it sounds like, can you explain please."