People v Allen (2026 NY Slip Op 50289(U))

[*1]

People v Allen

2026 NY Slip Op 50289(U)

Decided on March 9, 2026

Supreme Court, Kings County

Kitsis, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 9, 2026
Supreme Court, Kings County

The People of the State of New York

againstThomas Allen, Defendant.

Ind. No. 71433-25

For the defendant: Wadeedah SheeheedFor the People: Holly Hay and James Buchsbaum, Kings County District Attorney's Office

Michael D. Kitsis, J.

The defendant stands accused by indictment of one count each of Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03(3)), Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02(1)), and Criminal Possession of a Firearm (P.L. § 265.01-B(1)).
On February 2 and 4, 2026, the Court held a Mapp/Huntley/Dunaway hearing. The defendant moved to suppress noticed statements, as well as a firearm.
The noticed statements, made to Patrick Reilly while inside the 79th Precinct Interview Room, were, in sum and substance, as follows:
1) At 12:09 P.M., "A-l-l-e-n Allen. Thomas T-h-o-m-a-s. [XX XX], 1983. In a few weeks 41. Only difference is that age, you think you're young. That's why they say your body is a temple man."2) At 12:11 P.M., "1016 Washington Avenue. Bronx New York. 10156. 347-904-2587. I was working from um . . . but they let me go about two weeks ago. The boiler for buildings. Do the clean up and trash, they had manual compactors."3) At 12:12 P.M., "Yes. Yes. Yes. Yes. Yes. Yes."4) At 12:13 P.M., "There was already two officers on the floor wen I got there but, lets rewind a bit. Door was open, peoples were partying. I went to the window by the . . . So I went downstairs."5) At 12:15 P.M., "They asked me yo, did you call police? Yeah. He looked. He said I been . . . They asked me yo, did you call police. Yeah. She said I told the officers in the last precinct. The discrepancy probably came in, that's just my opinion. That one call was made, the next call was made. Probably call for the gun was made. Due to the fact that I didn't know that. I'm tell ya listen I called ya. But yeah, I was the one who called police. Everything else was just crazy after that. Yeah."6) At 12:15 P.M., "He just say it. Firearm. That's what I was told. That's my backpack but there was nothing in there. There should've been pictures in that backpack. Yeah, definitely my backpack. I'm not disputing that. I seen it when they brought it downstairs. [*2]Seen it when it was upstairs. There was nothing in that backpack but pictures, and a statement from my old case from my DD5. I know that for a fact. Everything else in there is probably like wires, portables. I know the portable was in the living room. My watch was in my pocket, what else? Yeah. Yeah that's probably it.7) At 12:19 P.M., "No. I had this bag, but I didn't have no firearm on me. When I gave my father the bag, he knew what was inside. Pictures. That's why he took it like that. But [my] thing is, they saying there's a firearm in the bag. What's that piece? Oh."8) At 12:20 P.M., "I know. I wouldn't be able to tell you that. I know the bag, was next to stuff, in a corner of the house. You got a lot of bags. Usual bags stuff like that yeah. Reusable bags, store bags, sneaker store bags, you name it there's bags in this corner. Yeah, so I always put my stuff in this corner. Yes. Yeah. So I know for a fact there was no firearm in there."9) At 12:22 P.M., "You will know when I become violent. I wasn't violent at all. Everyone kept saying yo he's yelling in my mother's face. Which was the lady I was talking about. Of course, I'm in her face. She's the one causing all the chaos. My dad is screaming, he's in pain. So like, how does this work."10) At 12:24 P.M., "The fight wasn't like some fight. This is a window, this is my hand, he's trying to get past me. I'm like bro I'm not letting you past me. You wanna get in a fight right now. You not in the right mind space. So, he's trying get in a fight right now. You not getting on a bike right now. You not in the right mind space. You trying to get on a bike right now you'll crash. I'm about to be upset right now."11) At 12:26 P.M., "At that time the bag was in my hand. I'm not saying my father tried to grab the bag. I just held the bag. I ain't give to him or throw it to him. Cause I was told I threw it, I never threw it. I ain't have to. [It] was in my hand. I'm doing what people do when they comply."12) At 12:27 P.M., "Imma be honest with you. I'm taking ownership of the bag. But I'm not gonna be able to tell you whose gun was."13) At 12:28 P.M., "I thought the same thing in the pen you. Like damn, how can I escape something that I didn't know about. You can't unless you chop it up. Because one, they gonna do forensics to it. So whoever's prints is on it even yours, they all get caught. So, if I did have my hands on it at that moment that shows that this content was together. That's what I'm trying to tell you. We gonna find out, I got the gun so. All I can tell you is that. I never seen it."14) At 12:36 P.M., "Yeah. Whatever it takes right. Yessir. So, the bottom is you? Just making sure."At the hearing, two witnesses, P.O. Tobias Dutan and P.O. Demitrious Peterson, testified for the People. The People also introduced four exhibits: a DVD of P.O. Dutan's body-worn camera footage; a DVD of the debriefing; two photographs of the firearm; and a DVD of P.O. Peterson's body-worn camera footage. The defendant did not call any witnesses and introduced one exhibit, a Miranda form. The Court finds that the witnesses testified credibly, and makes the following findings of fact and conclusions of law.
Findings of FactP.O. Dutan testified that he has been employed as a member of the New York City Police Department (NYPD) for nine years, and has been assigned as a patrol officer in Police Service Area (PSA) 3, covering the areas in and around the city housing projects located in the [*3]Bushwick, BedStuy, Fort Greene, and Williamsburg neighborhoods, for the last eight years. He is responsible for responding to 911 calls.
On November 24, 2024, P.O. Dutan was working and assigned to Sector B, covering the Marcy Houses within the 79th Precinct. He was in uniform with a partner, P.O. Gurung, and was equipped with body-worn camera footage. At approximately 1:30 A.M., the officers were patrolling when they received a 911 call for a dispute with a firearm at 121 Nostrand Avenue, Apartment 5W.[FN1]
The apartment is located within a public housing complex. The 911 call also included the following description: male wearing all black with red sneakers and bald head. The 911 call did not mention a bag and did not mention where the firearm had been observed.
The officers responded to the fifth floor of 121 Nostrand Avenue and observed a man lying on the floor. The officers asked the man what happened and the man said he needed an ambulance. The man was hostile toward the officers and appeared intoxicated. P.O. Dutan did not observe any injuries on the man, who stated he had fallen down and could not get up. The man said he felt lightheaded and that he had told his son to call the police. He did not say he had been assaulted and did not say anyone had pistol whipped him.
P.O. Dutan knocked on the door of Apartment 5B; it appeared that there was a loud party happening inside the apartment. He observed a man walking up the stairs. The man was Black, wearing all black with red sneakers and a bald head. The man, identified as the defendant, had a red book bag on his shoulder. The defendant said he had called the police at his father's request. P.O. Dutan approached the defendant, because he matched the description from the 911 call, and the defendant immediately turned around, "blading" his body so that part of his body and the bag were hidden by the wall. The bag was in the defendant's left hand; the defendant also had a cell phone in the same hand. P.O. Dutan stopped the defendant, and the defendant placed the bag on the floor. P.O. Dutan frisked the defendant's waistband, because that is an area where people conceal firearms. P.O. Dutan did not recall what he said to the defendant. More police officers continued to arrive as P.O. Dutan was frisking the defendant, and people exited Apartment 5B into the hallway, including some women who asked what was going on. The women did not say that anyone had menaced them or brandished a weapon, and did not say that the defendant had assaulted or pistol whipped his father. One woman was holding a cup in her hand, and both appeared possibly intoxicated.
While P.O. Dutan was frisking the defendant, he heard P.O. Peterson [FN2]
say, "92." P.O. Peterson was standing a few feet away and was frisking the defendant's bag. P.O. Dutan understood "92" to mean arrest, and so he and another officer handcuffed the defendant. P.O. Dutan did not see a firearm, did not look instead the bag, and did not hear P.O. Peterson say that he had found a firearm. The civilians in the hallway asked what "92" meant and one woman said the defendant did not do anything.
P.O. Dutan escorted the defendant outside and transferred custody of the defendant to P.O. Peterson. P.O. Dutan remained on the scene, then went to the 79th Precinct, arriving between 2:00 and 2:30 A.M. Another officer had already transported the defendant to the 79th [*4]Precinct.[FN3]
Around 3:00 or 4:00 A.M., P.O. Dutan left the 79th Precinct and brought the defendant to PSA 3. At 11:00 A.M., while at PSA 3, P.O. Dutan generated a Miranda form because it was required for inclusion in the arrest report. On the form, P.O. Dutan wrote that the defendant "refused" to answer questions. P.O. Dutan testified that the defendant did not, in fact, refuse, but that he wrote "refused" on the form because he knew the defendant would later be debriefed by a detective. P.O. Dutan also explained that he believed "refused" meant "not applicable." When filling out the form, P.O. Dutan obtained pedigree information from the defendant. He did not ask the defendant any other questions.
Between 11:30 A.M. and noon, P.O. Dutan brought the defendant back to the 79th Precinct, where the defendant was debriefed by Det. Reilly. P.O. Dutan was present for the debriefing, which began at 12:08 P.M. He observed Det. Reilly read Miranda warnings from a form to the defendant. Neither P.O. Dutan nor Det. Reilly was armed, and neither of them made any threats or promises to the defendant. The defendant was not handcuffed in the debriefing room, and there was no physical contact between the defendant and either P.O. Dutan or Det. Reilly.
After the Miranda warnings were read to the defendant, he agreed to speak to Det. Reilly.
At the 79th Precinct, P.O. Dutan did not interact with the defendant outside of the debriefing room. He did not know what time the defendant arrived at the 79th Precinct and did not know if the defendant had been given food or water.
After the debriefing, the defendant was transported to PSA 3, because P.O. Dutan works there and was assigned to be the arresting officer. P.O. Dutan was aware that a loaded firearm was recovered.
P.O. Peterson testified that he has been employed by the NYPD for approximately five years, assigned to the 79th Precinct, where he currently works as a field training officer. On November 24, 2024, he was part of the neighborhood safety team, where he was responsible for addressing conditions within the precinct. He has participated in approximately 100 firearm-related arrests and has recovered approximately 100 firearms from individuals, bags, jackets, and similar locations. He has identified firearms based on their weight, shape, and feel.
On November 24, 2024, P.O. Peterson was working with his partner, P.O. Driscoll. He was in uniform and equipped with body-worn camera. At approximately 1:30 A.M., he received a call over the radio reporting a male with a firearm at 121 Nostrand Avenue, Apartment 5B, in Kings County. The call described a Black male, wearing all black with a bald head and red sneakers. The description did not include any mention of a red bag.
P.O. Peterson responded to the location, which is within an apartment complex. Other officers were already present and interacting with the defendant. There was another individual lying on the floor and some women in the hallway. As P.O. Peterson walked up the stairs, he observed a Black man wearing all black with red sneakers drop a red bag.[FN4]
P.O. Peterson [*5]immediately picked up the bag, which was closed, and began to conduct an external frisk of the bag, squeezing the outside of it. He did not observe the outline of a firearm in the bag. He felt an object which had the weight and shape of a firearm. P.O. Peterson alerted the other officers to place the man, identified as the defendant, under arrest. The defendant was arrested and brought outside. P.O. Peterson spoke with Sgt. Padilla, who instructed P.O. Peterson to turn off his body-worn camera, and P.O. Peterson turned the camera off. P.O. Peterson and Sgt. Padilla talked about whether the arrest would be processed by offices from PSA 3 or from the 79th Precinct. Roughly ten minutes later, P.O. Peterson reactivated his body-worn camera.
P.O. Peterson and his partner transported the defendant and his backpack to the 79th Precinct. P.O. Peterson did not recall saying anything to the defendant or hearing his partner say anything to the defendant.
Once at the precinct, the defendant was lodged in a cell. P.O. Peterson opened the bag to confirm that the item inside was a firearm and observed a firearm in some netting toward the back of the bag's interior. P.O. Peterson did not recall if he ever looked inside the bag and confirmed that it contained a firearm prior to entering the precinct, and the first time he recalls opening the bag is when he opened it at the precinct. At some point the defendant was transported to PSA 3.
Since arresting the defendant, P.O. Peterson has made approximately 20 arrests.

Conclusions of Law
Dunaway/Mapp
In a motion to suppress evidence obtained as the result of police conduct, the People have the initial burden of production to establish the legality of the police conduct in the first instance. See People v. Berrios, 28 NY2d 361 (1971); People v. Whitehurst, 25 NY2d 389 (1969). Once that burden has been met, the burden of persuasion shifts to the defendant to establish, by a preponderance of the evidence, that the police conduct was unlawful. See Berrios, supra; People v. Dunbar, 188 AD3d 1247 (2d Dept. 2020).
In this case, P.O. Dutan and P.O. Peterson responded to a report of a dispute involving a man with a firearm. P.O. Dutan observed the defendant, who appeared to match the reported description of a bald Black man wearing black clothing and red sneakers, exiting the stairwell. P.O. Dutan approached the defendant and observed the defendant turn the side of his body and his bag away from the officer. P.O. Dutan stopped the defendant and frisked the defendant's outer garments. During this process, the defendant dropped his bag, which P.O. Peterson picked up and frisked.
A frisk of an individual's outer garments requires reasonable suspicion that the individual has committed, is committing, or is about to commit a felony or misdemeanor, as well as reason to suspect that the police officer is in danger of physical injury by virtue of the individual being armed. See People v. De Bour, 40 NY2d 210, 223 (1976). P.O. Dutan testified that he approached the defendant because the defendant matched the description from the 911 call. There was no evidence identifying the 911 caller, or the source of the caller's information — whether it came from personal observation, or whether it was mere "unsubstantiated rumor, unfounded accusation or conclusory characterization[.]" People v. Thomison, 238 AD3d 905, 907 (2d Dept. 2025) (quoting People v. Mortel, 197 AD3d 196, 204 (2d Dept. 2021)).
"Where an anonymous phone tip giving a general description and location of a 'man with a gun' is the sole predicate, it will generate only a belief that criminal activity is afoot, and will [*6]not of itself constitute reasonable suspicion thereby warranting a stop and frisk of anyone who happens to fit that description." People v. Muhammad, 231 AD3d 868, 869 (2d Dept. 2024) (citations omitted). In this case, there is no evidence that the 911 caller was identifiable, or that the officers "were afforded a means of verifying the source of the information[.]" Id. at 871 (citations omitted).
Here, "the defendant matched the general description of a man with a gun at the subject location," (People v. Abdul-Mateen, 126 AD3d 986, 988 (2d Dept. 2015)), permitting P.O. Dutan to exercise his common-law right to inquire. When P.O. Dutan approached the defendant, the defendant "bladed" his body, concealing part of his body and his bag from the officer. The defendant's conduct, "coupled with the nature of the report . . . escalated the encounter and justified" the frisk of the defendant. People v. Abdul-Mateen, 126 AD3d at 988. See also People v. Alleyne, 237 AD3d 734 (2d Dept. 2025); People v. Palm, 238 AD3d 787 (2d Dept. 2025); People v. King, 164 AD3d 915 (2d Dept. 2018); People v. Abdul-Malik, 298 AD2d 595 (2d Dept. 2002).
While P.O. Dutan was frisking the defendant, P.O. Peterson arrived and picked up a red bag from the ground near the defendant. P.O. Peterson immediately frisked the outside of the bag. He testified that he felt an object with the weight and shape of a firearm and alerted the other officers, who placed the defendant under arrest. He did not open the bag while at the apartment, or otherwise confirm that it contained a firearm. The defendant was transported to the precinct and lodged in a holding cell. P.O. Peterson then opened the bag and recovered the firearm.
In the context of a warrantless search of a closed container incident to an arrest, a bag "within the immediate control or 'grabbable area' of a suspect at the time of his arrest may not be subjected to a warrantless search incident to the arrest, unless the circumstances leading to the arrest support a reasonable belief that the suspect may gain possession of a weapon or be able to destroy evidence located in the bag." People v. Gokey, 60 NY2d 309, 311 (1983); see also People v. Mabry, 37 NY3d 933 (2021); People v. Geddes-Kelly, 163 AD3d 716 (2d Dept. 2018). The People bear the burden of establishing exigent circumstances justifying the search. See People v. Jimenez, 22 NY3d 717 (2014); People v. Gokey, supra; People v. Hernandez, 40 AD3d 777 (2d Dept. 2007). Additionally, "the search must have been conducted contemporaneously with the arrest." Gokey, 60 NY2d at 312. See also People v. Smith, 59 NY2d 454 (1983); People v. Alvarado, 126 AD3d 803 (2d Dept. 2015).
In this case, P.O. Peterson did not open the bag until the defendant was securely detained in a holding cell and did not pose any potential threat; the bag was not in the defendant's immediate control or "grabbable area." See People v. Thompson, 118 AD3d 922 (2d Dept. 2014); see also People v. Grimes, 175 AD3d 712 (2d Dept. 2019). Law enforcement had full control of the defendant's bag, and there was no risk of evidence destruction or harm to the public or law enforcement. See People v. Chy, 184 AD3d 664 (2d Dept. 2020); People v. Houston, 143 AD3d 737 (2d Dept. 2016); Thompson, supra; People v. Hernandez, 40 AD3d 777 (2d Dept. 2007).
The search was entirely divorced, spatially and temporally, from the arrest, and any earlier exigency had dissipated entirely. The search therefore failed to meet the requirements for a lawful search incident to arrest. Consequently, the search of the bag could only have been lawful if authorized by a search warrant or voluntary consent, neither of which was obtained prior to the search.
The defendant's motion to suppress physical evidence and evidence recovered as a result of a stop and frisk of his bag, specifically, the firearm, is granted.
However, it does not automatically follow that the defendant's statement must be suppressed as a fruit of the unlawful search.
Assuming that the failure to corroborate, while on the scene, that the bag in fact contained a firearm precludes a finding of probable cause to arrest the defendant, any statement made after that unlawful seizure "is not subject to suppression if the People adequately demonstrate that the inculpatory admission was 'attenuated' from the improper detention; in other words, it was 'acquired by means sufficiently distinguishable from the arrest to be purged of the illegality.'" People v. Bradford, 15 NY3d 329, 333 (2010) (quoting People v. Conyers, 68 NY2d 982, 983 (1986)). "That determination requires consideration of the temporal proximity of the arrest and the confession, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct." People v. Conyers, 68 NY2d at 983. "The postarrest administration of Miranda warnings by the police is an important but not a conclusive factor in determining whether the confession was obtained by exploitation of the illegal arrest." Id.
The defendant's statement was made after he had been transported to the precinct, processed, and brought to the interview room. The interview was conducted by Det. Reilly, who appears not to have been present at the arrest of the defendant or during the search of his bag. The change in location and personnel, as well as the passage of time, and the issuance of Miranda warnings "constituted a definite and pronounced break sufficient to dissipate the taint of any prior illegality associated with the defendant's arrest." People v. Alexander, 63 AD3d 1166, 1168 (2d Dept. 2009). Therefore, the defendant's motion to suppress the noticed statement as a "fruit" of an unlawful search is denied.
HuntleyAt a Huntley hearing, the People bear the burden of going forward in the first instance, and must prove the voluntariness of any statements by the defendant beyond a reasonable doubt. People v. Huntley, 15 NY2d 72 (1965); see also People v. Guilford, 21 NY3d 205 (2013). Statements obtained as the result of custodial interrogation must be suppressed unless they were made subsequent to proper Miranda warnings. See, e.g., Rhode Island v. Innis, 446 U.S. 291 (1980); People v. Ferro, 63 NY2d 316 (1984); People v. Huffman, 41 NY2d 29, 33 (1976).
Miranda warnings are required prior to "custodial interrogation [that is] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "[B]oth the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda." People v. Huffman, 41 NY2d 29, 33 (1976).
In this case, the noticed statement was made at the precinct, while the defendant was in custody, after Det. Reilly read Miranda warnings to the defendant. The defendant was brought into an interview room, uncuffed, and neither Det. Reilly nor P.O. Dutan was armed, had many any threats to the defendant, or had promised anything to the defendant. Although P.O. Dutan's explanation of his decision to write "refused" on the Miranda form raises questions about P.O. Dutan's judgment and competence, the Court credits P.O. Dutan's testimony that when he prepared the form, he had not questioned the defendant and that the defendant had not in fact [*7]refused to answer questions. The Court finds that the defendant did not invoke his right to remain silent. Therefore, there was no issue of Det. Reilly failing to "scrupulously honor" the defendant's right to remain silent and it was permissible for Det. Reilly to ask the defendant if he was willing to answer questions.
Based on the totality of the circumstances, the Court finds that the People established beyond a reasonable doubt that the defendant's noticed statements were voluntarily made, and that the defendant knowingly and intelligently waived his rights. See, e.g., People v. Jin Cheng Lin, 26 NY3d 701 (2016); People v. Anderson, 42 NY2d 35 (1977). The defendant's motion to suppress the noticed statements is denied.
This constitutes the Decision and Order of the Court.
Dated: March 9, 2026Brooklyn, New YorkHon. Michael D. Kitsis, J.S.C.

Footnotes

Footnote 1:P.O. Dutan identified the apartment as "5 wood" which the Court understands to mean Apartment 5W. The Court believes the officer meant to refer to Apartment 5B.

Footnote 2:P.O. Dutan had not previously worked with P.O. Peterson, who works in the 79th Precinct.

Footnote 3:P.O. Dutan did not recall which officer transported the defendant from the apartment building to the station house. The defendant was handcuffed during transport.

Footnote 4:On the body-worn camera footage in evidence, P.O. Peterson told other police officers that the defendant "threw" the bag. When he testified in the grand jury, he stated that the defendant "dropped" the bag or "placing" it down.